# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| LORETTA PLATT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:08-CV-57 PPS |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Loretta Platt appeals the Social Security Administration's decision to deny her application for disability insurance benefits. An administrative law judge found that Platt was disabled within the meaning of the Social Security Act, but only for a limited period of time. The ALJ found that, as of November 19, 2004, Platt was no longer disabled because she could perform a significant number of jobs in the national economy. That decision was supported by substantial evidence, and so it is affirmed.

## I. BACKGROUND

Platt is a 39 year old woman who has previously worked as a cafeteria worker, a secretary, a receptionist, and a delivery driver. (R. 129, 329, 348.) In May 2002, she alleges that she became disabled and quit working due to degenerative disc disease, back pain, depression, anxiety, and eye problems. (R. 347). The ALJ found that Platt was indeed disabled for a period of time but that her condition eventually improved to the point that she was no longer disabled. The only issue Platt raises on appeal is whether she remained disabled after November 19, 2004 due to her back pain and disc disease.

A.      **Medical History**

Platt's relevant medical history relating to her back problems spans from 2002 to 2007, and while tedious, a full accounting of it is necessary to properly frame the issue for this appeal. The first record of her back pain is in February 2002, when Platt went to the emergency room complaining of severe lower back pain. (R. 495-96.) She was diagnosed with an acute low back strain; she was given pain medication and discharged. *Id*.

On June 5, 2002, Platt was referred to Dr. Sandra Valdez, M.D., who recommended that she undergo an MRI of her spine. (R. 492-94.) Platt's MRI revealed a disc herniation, nerve root compression and moderate to severe spinal stenosis. (R. 518.) As a result of what the MRI showed, back surgeon, Dr. Jeffrey Crecelius, M.D., performed a lumbar diskectomy on Platt. (R. 511-12). But by September 2003, Platts' back pain returned, causing her primary care physician to prescribe a steroid and refer her once again to Dr. Crecelius who concluded that she probably had recurrent herniation. (R. 446, 449.) A couple weeks later, Platt's back pain improved; Dr. Crecelius noted that Platt was able to move comfortably and that she "had a great week." (R. 445.)

On January 8, 2004, Platt had another MRI of her lumbar spine which showed that her back had "progressed from a bulge to a herniation at the L4-5 segment." (R. 441, 502-03.) At a follow-up appointment a few days later, Dr. Crecelius told Platt that he had concerns whether additional surgery would be effective in correcting the herniation given that Platt is a heavy smoker. (R. 441.) But notwithstanding Dr. Crecelius' concerns about the effectiveness of surgery, a few weeks later Platt had a second lumbar surgery. At the follow-up appointment, Dr. Crecelius noted that, while Platt had "some persistent pain," she was able to move about

comfortably. (R. 498-99; 412.)

The following month, Dr. Crecelius noted that Platt's pain remained better than before surgery. (R. 411.) Yet within a month, Platt was complaining of severe pain in her lower extremities, pain which Dr. Crecelius noted was "only marginally improved from her [second] preoperative status." (Tr. 86.) Dr. Crecelius wrote that Platt was "actually having this pain when I last saw her, though at that time it was my impression that she was predominantly having back pain." *Id.*

Platt had a second MRI on April 28, 2004, which again revealed that the herniation of the disc persisted which continued to produce stenosis in her back. (R. 78-79.) Thereafter, Platt visited the emergency room twice, complaining of back pain. (R. 390-93.) Finally, on May 18, 2004, Platt had another lumbar diskectomy. (R. 260-61.) A month after the surgery Dr. Crecelius noted that Platt still had back pain, but that her lower extremity pain was "at least 50% better . . . [and] she is not taking any narcotics." (R. 360.)

Platt had a third MRI on July 23, 2004, which revealed a mild disc bulge and mild associated spinal stenosis. (R. 211-12.) When Platt returned to Dr. Crecelius a couple weeks later, he noted that her condition seemed to have greatly improved. There was "no evidence of recurrent herniation or nerve root displacement" although Platt did walk with a "slow careful gait." (R. 74.) Dr. Crecelius again noted that Platt's chronic back pain was "related to three level degenerative changes and continued smoking." *Id.* He also reported that "[i]t would probably be helpful in the long term if she were able to stop smoking and do some home exercises." *Id.*

In August and September 2004, Platt visited Dr. Bluming, her primary care physician, who noted that she was "not taking anything for pain" and her back was "non-tender." (Tr. 70).

3

Dr. Bluming referred Platt to a specialist, Dr. Greenwald.  On September 14 and September 17, Platt visited the emergency room with complaints of back pain. (R. 55-56, 256-57.)  At each visit, Platt was given medications and was discharged. *Id*.

On October 5, 2004, Platt saw Dr. Greenwald, who noted that she showed signs of "lumbar stenosis with radicular pain," "post laminectomy pain," and "facet arthropathy." (R. 63.) When Platt returned to Dr. Greenwald two months later with complaints of back pain, he ordered an EMG/nerve conduction study. (R. 205-06.)  In addition, Dr. Greenwald echoed Dr. Crecelius' earlier opinion: that Platt's smoking was a "contributing or at least an aggravating factor of her condition." *Id*.  On December 15, 2004, Platt's EMG/nerve conduction study test revealed that:

> 1. There is no electrophysiological evidence for bilateral lower extremity peripheral neuropathy.
> 2. there is electrophysiological evidence for left L4 radiculopathy which is chronic which cannot be differentiated if recurrent, persistent, or new . . . [and]
> 3. High amplitude unit potential in right gastrocnemius muscle and absent H reflex, compatible but not indicative of right L5-S1 radiculopathy.  However [new radiculopathy or arachnoiditis] is chronic and mild.

(R. 83.)  During this visit, Dr. Cheng Du, M.D., noted that Platt "has no motor weakness" and "can stand up on heels and toes." *Id*.  Dr. Du further noted that all of the nerves in Platt's lower extremities were normal. *Id*.

On January 6, 2005, Platt returned to Dr. Greenwald following an epidural steroid injection. (R. 198-99.)  Dr. Greenwald noted that Platt had difficulty tolerating the epidural and recommended chronic opioid therapy. *Id*. So Dr. Greenwald prescribed OxyContin for Platt.  In doing so, he discussed his "strict policies in regards to controlled substances" and made her sign a "narcotics agreement." (R. 197.)  However, on January 24, 2005, Dr. Greenwald wrote a letter to Platt explaining that he would no longer be able to serve as her physician because she violated

4

the narcotics agreement by failing a random drug test. *Id*.

Platt then began seeing Dr. Robert Bigler, M.D., who gave Platt two epidural injections on February 28, 2005 and March 21, 2005. (R. 171-72.) On May 19, 2005, Platt returned to Dr. Bigler complaining of pain in her back and leg. (R. 173.) Dr. Bigler adjusted Platt's pain medicine and discussed the possibility of a discogram, which is a test that can be run to identify the specific location of back pain. *Id*.

On May 11, 2005, Dr. Bigler performed a CT scan of Platt's lumbar spine, which showed that the nerve root at L3-4 was "at risk" but not compressed or damaged. (R. 213-214.) At a follow-up visit on August 23, 2005, Dr. Bigler referred Platt to a specialist to see if a spinal fusion surgery was appropriate. (R. 228.) On August 31, 2005, Dr. John Fiederlein, M.D., performed an MRI on Platt, which showed smaller disc protrusion at L4-5 and stable findings at L3-4 and L5-S1. (R. 185-86.)

On September 21, 2005, Platt returned to Dr. Crecelius complaining of pain that was aggravated by standing but was "not to the intensity that she has when she has a pinched nerve." (R. 183.) Dr. Crecelius recommended a spinal cord simulator trial. *Id*.

On January 17, 2006, Platt returned to Dr. Bigler, who noted that she was "in no apparent distress" and had only "mild discomfort" in moving from a sitting to a standing position. (R. 223). Although she limped favoring her right leg, she had normal reflexes and a straight leg raise was negative. *Id*. Dr. Bigler planned to continue Platt on pain medicine and ordered a follow-up in a few months. *Id*. At her follow-up, Dr. Bigler continued to note that Platt did not have any apparent distress and that she had "good range of motion with extension, flexion, and rotation" and that there were no abnormalities in her physical exam. (R. 279.) Sometime after

5

that date, Dr. Bigler stopped seeing Platt because drug tests once again showed that she violated another narcotics agreement. (R. 637-38.)

On November 17, 2006, Platt had a consultative examination with Dr. Jean Perrin, M.D. (R.607-17.) At her exam, Platt reported that she was "able to perform basic activities of daily living." (R. 608.) Upon physical examination, Dr. Perrin reported the Platt's cervical spine revealed no tenderness or muscle spasm. (R. 609.) Platt was "able to walk on toes and walk on heels" as well as "perform a squat maneuver without difficulty." (R. 611.) In his final assessment, Dr. Perrin determined that Platt "should be able to work 8 hours a day in a seated or standing position" so long as she was able to change positions frequently. *Id*.

On December 7, 2006, Platt again had epidural injections for pain management (R. 310.) On January 5, 2007, when Platt visited the emergency room for back pain, the examining physician noted back tenderness, reduced range of motion, positive straight leg raising on the left, and mildly decreased sensation in her left foot. (Tr. 290). Otherwise, Platt's muscle strength and reflexes were normal. *Id*.

On March 8, 2007, when Platt returned to the emergency room, the examining doctor noted tenderness, positive straight leg raising, and muscle spasm. (R. 311.) Finally, on March 26, 2007, Plaintiff cancelled a fourth surgery scheduled with a new doctor because she did not get clearance from Medicaid. (R. 310.)

**B.    Hearing Testimony**

At the hearing before the ALJ, medical expert Dr. Arthur Louber, M.D. testified as a

consulting expert. (R. 14.)¹ After reviewing the record, Dr. Louber concluded that Platt was disabled, but only for a limited period of time from May 2002 until November 2004, with her disability ending six months after her most recent back surgery. (R. 643.) Thereafter, Dr. Louber saw no evidence of a "significant focal neurological deficit" that would cause Platt to meet any § 1.04 listing. *Id*. As a result, Dr. Louber opined that Platt could function at a sedentary level, sitting for a total of six hours, thirty minutes at a time, and standing for a total of two hours, thirty minutes at a time. *Id*.

Vocational expert Stephanie Archer also testified at the hearing. She said that, given the residual functioning capacity ("RFC") described by Dr. Louber and the limitations described by Platt in the record and in her testimony, Platt would be able to perform her past relevant work as a secretary. (R. 646.)

### C. The ALJ's Decision

The regulations identify degenerative disc disease as a 'disorder of the spine' that would prevent an individual from doing any gainful activity so long as it is accompanied by (1) evidence of nerve root compression, (2) spinal arachnoiditis, or (3) lumbar spinal stenosis resulting in pseudoclaudication. 20 C.F.R. pt. 404, subpt P, App. 1, § 1.04(A).

The ALJ found that Platt had degenerative disc disease accompanied by nerve root compression which met the criteria listed in § 1.04(A), but only for a limited and specified time period – May 22, 2002 to November 18, 2004. (R. 17-19.) As of November 19, 2004, the ALJ

---

1          Forensic psychologist Dr. Donald Olive also testified at the hearing. But in her appeal, Platt does not dispute the ALJ's findings concerning her depression or mood disorder, so Olive's testimony is irrelevant to this appeal.

7

found that medical improvement occurred, which resulted in Platt no longer having nerve root compression, or either of the other aggravating factors listed in § 1.04(A). As a result, the ALJ found that after November 18, 2004, Platt's impairments no longer met or equaled a listed impairment. (R. 19-20.) Further, after that date, the ALJ found that Platt's statements concerning the intensity and limiting effects of her symptoms were not entirely credible. (R. 21.) Although Platt reported pain after November 19, 2004, the ALJ noted that evaluations subsequent to that date revealed that she was "neurologically intact" with no "focal neurological defects." (R. 22.) The ALJ specifically cited to Dr. Louber's testimony and Dr. Perrin's written evaluation to support his finding that as of November 19, 2004, Platt had the RFC to perform sedentary work, including her past relevant work as a secretary. (R. 22-23.) Therefore, the ALJ held Platt ceased being disabled as of November 19, 2004. (R. 14.)

## II. DISCUSSION

Platt makes four arguments on appeal: (1) the ALJ failed to consider medical evidence favorable to her claims and, instead, relied upon the medical expert's testimony in determining the end date of her disability; (2) the ALJ failed to identify any medical improvement in support of his decision to lift her period of disability; (3) the ALJ improperly relied upon a questionnaire Platt filled out in the midst of her disability ; and (4) the ALJ failed to consider whether Platt could perform her past relevant work.

If the ALJ's findings of fact are supported by "substantial evidence" then they must be sustained. 42 U.S.C. § 405(g). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nelms v. Astrue,* 553 F.3d 1093, 1097 (7th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971)).

Review of the ALJ's findings is deferential. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). In making a substantial evidence determination, I will review the record as a whole, but will not re-weigh the evidence or substitute my judgment for that of the ALJ. *Id*.

"Although this standard is generous, it is not entirely uncritical." *Id*. at 462 (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)). This Court must ensure that the ALJ has built a "logical bridge" between the evidence and the result. *Getch v. Astrue*, 539 F.3d 473, 481 (7th Cir. 2008). However, if reasonable minds could differ on whether a claimant is disabled, the court must affirm the Commissioner's decision denying benefits. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Since Ms. Platt was found by the ALJ to be disabled from May, 2002 through November, 18, 2004, the only issue on appeal is whether her disability ended on the latter date. The regulations set out an eight-step inquiry to answer that question:

> (1) Is the claimant engaged in substantial gainful activity? If so, the disability has ended.
>
> (2) If not, does the claimant have an impairment or combination of impairments which meets or equals the severity of a listed impairment? If so, the disability will be found to continue.
>
> (3) If not, has there been a medical improvement? If so, go to step (4). If not, go to step (5).
>
> (4) Is the medical improvement related to the claimant's ability to do work; *i.e.,* has there been an increase in the claimant's RFC? If not, go to step (5). If so, go to step (6).
>
> (5) If at step (3) there has been no medical improvement, or if at step (4) medical improvement is not related to ability to do work, do any exceptions apply? If [so], then we look to step (6). If an exception from the second group applies, then the disability has ended.
>
> (6) Are the claimant's current impairments severe in combination? If not, the

> disability has ended.
>
> (7) If so, can the claimant (based on his or her residual functional capacity) perform his or her past relevant work? If so, the disability ends.
>
> (8) If not, can the claimant do other work given his or her residual functional capacity, age, education, and work experience? If so, the disability has ended.

20 C.F.R. § 404.1594(f); *Hannum v. Barnhart*, 2005 WL 1799433 at *5 (S.D. Ind. July 27, 2005).

The eight-step inquiry primarily focuses on whether the claimant has experienced 'medical improvement' since he or she was last found to be disabled. *Id.* The regulations define a medical improvement as "any decrease in the medical severity of [the claimant's] impairment(s)." 20 C.F.R. § 404.1594(b)(1). A determination that a medical improvement has occurred may be based on changes in the claimant's symptoms or laboratory findings associated with the alleged impairment. *Id.*

Platt's arguments primarily concern the ALJ's analysis of her medical improvement after November 18, 2004. Specifically, Platt argues that in finding evidence of a medical improvement, the ALJ relied upon the medical expert's testimony rather than the results of Platt's December 15, 2004 EMG/nerve conduction study test (R. 83), her May 11, 2005 CT scan (R. 176-78), and her August 31, 2005 MRI. (R. 184-86.)

An ALJ "need not discuss every piece of evidence in the record." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. Aug. 28, 2009). Yet in this case, the ALJ cited to each of the aforementioned tests in his opinion and discussed their respective results. Because none of the post-November 18, 2004 tests showed nerve compression, the ALJ found that Platt no longer met the criteria of §1.04(a). Recall that in order for a claimant to be considered disabled under §

1.04(a) there must be evidence of nerve root compression (or other problems not relevant here). *See* 20 C.F.R. pt. 404, subpt P, App. 1, § 1.04(A). As the ALJ aptly pointed out, no such evidence existed after November 2004. While the ALJ relied upon the testimony of Dr. Lorber in arriving at his RFC, it is apparent that he also relied upon the results of Platt's EMG, CT Scan, and MRI. Therefore, Platt's contention that the ALJ failed to weigh the entirety of the medical evidence is incorrect.

Further, Platt argues that the ALJ failed to identify any 'medical improvement' that occurred after November 18, 2004, and ignored the record of her ongoing pain after that date. The "medical improvement" standard under § 404.1594 "requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits." *Delph v. Astrue*, 538 F.3d 940, 945 (8th Cir. 2008). But as just discussed, the ALJ identified the portion of the record prior to November 18, 2004 that showed evidence of "nerve root compression." (R. 19.) The ALJ also highlighted the medical expert testimony that each MRI done prior to that date showed nerve root compression that met listing § 1.04(a). *Id.* In contrast, the ALJ found that after November 18, 2004, the record did not show any evidence of nerve root displacement. *Id.* The ALJ also identified other indications of Platt's medical improvement including Dr. Crecelius' opinion that Platt's lower extremity pain was 50% better on June 18, 2004 and the aforementioned diagnostic tests which showed an absence of nerve root compression. (R. 19-20.)

Although Platt argues that the ALJ arrived at the incorrect conclusion in analyzing her medical record after November 18, 2004, this Court is not permitted to re-weigh the evidence. *See Liskowitz v. Astrue*, 559 F.3d 736, 742 (7th Cir. 2009) (citing *Donahue v. Barnhart,* 279 F.3d

441, 444 (7th Cir. 2002) ("[T]he resolution of competing arguments based on the record is for the ALJ, not the court.")). Instead, I must insure that the ALJ built a logical bridge between the evidence and the result. In this case, the ALJ compared Platt's current condition with the condition existing when she was disabled, along with identifying evidence of medical improvement that a reasonable mind might accept as adequate to support a conclusion. As a result, the ALJ's finding of medical improvement under § 404.1594 will not be disturbed.

As to Platt's complaints of pain, "[t]here is no presumption of truthfulness for a claimant's subjective complaints; rather, an ALJ should rely on medical opinions based on objective observations and not solely on a claimant's subjective assertions." *Knox v. Astrue*, 327 Fed. Appx. 652, 655 (7th Cir. June 19, 2009). That is precisely what the ALJ did in this case. Consistent with the medical opinions of Dr. Lorber and Dr. Perrin, the ALJ held that Platt had the RFC to perform sedentary work after November 18, 2004. (R. 22.) Because substantial evidence supports the ALJ's finding, Platt's argument on this point fails.

Platt also argues that the ALJ improperly relied upon a questionnaire in support of his decision that she is no longer disabled. Because Platt filled out the questionnaire in February 2004, during her period of disability, she argues that it is inapplicable to her status after November 18, 2004. Contrary to Platt's argument, there is no indication that the ALJ used this questionnaire in determining whether Platt met the criteria of Listing 1.04(a) at step two of the eight-step inquiry. *See* 20 C.F.R. § 404.1594(f). Instead, the ALJ cited to the questionnaire at step seven of the eight-step inquiry, noting that the activities Platt was able to perform at the time she filled out her questionnaire were "not inconsistent with the ability to do sedentary work." (R. 21.) This was one of seven factors the ALJ examined in determining that Platt was able to

12

perform her past relevant work. As such, even if the ALJ's reliance upon the questionnaire was improper, his findings of fact are, nonetheless, supported by substantial evidence.

Finally, Platt argues that the ALJ did not properly evaluate whether she was able to perform her past relevant work as a secretary. Platt gives no further explanation in support of this statement, and has thus failed to develop her argument. *See Hardrick v. City of Bolingbrook,* 522 F.3d 758, 762 (7th Cir. 2008) (holding that cursory and undeveloped arguments are waived). In any event, the ALJ properly considered the issue, citing to the testimony of the vocational expert in arriving at his conclusion that Platt could perform her past work as a secretary. *See* 20 C.F.R. § 404.1560 (b)(2) ("a vocational expert or specialist may offer relevant evidence . . . concerning the physical and mental demands of a claimant's past relevant work"). Accordingly, the ALJ supported his opinion with substantial evidence.

### III. CONCLUSION

The ALJ provided legitimate reasons for his decision, demonstrated consideration of both the medical and non-medical evidence in the record, and adequately explained why he weighed some evidence more favorably than others. Therefore, the Court **AFFIRMS** the judgment of the Administrative Law Judge that Platt has not been disabled since November 19, 2004.

**SO ORDERED**.

ENTERED: November 30, 2009

       /s Philip P. Simon
       Philip P. Simon , Judge
       United States District Court